CHARLES W. RIGDON

*v.*

ELBERT W. SHIRK.

*Filed at Ottawa January 25, 1889.*

1. CLOUD UPON TITLE—*in what it may consist.* A cloud is the semblance of a title, either legal or equitable, or a claim of an interest in land appearing in some legal form, but which in fact is unfounded, or which it would be inequitable to enforce.· If the claim sought to be removed is valid, and may be enforced, either at law or in equity, it is not a cloud.

2. CONTRACT—*giving option to purchase land—validity of contract.* A written contract by the owner of land, giving the person therein named an option or right, at his election, to purchase the same at a certain price, and within a time therein specified, if fairly made upon sufficient consideration, is valid and binding. If not otherwise provided, such a contract may be assigned, and is of value to the holder.

3. SAME—*contract for purchase of land—options held in the interest of several—relation between the latter.* A, the owner of certain options for the purchase of a number of lots of land, transferred the same to B, to be held and used by him on joint account. B gave back a writing, certifying that A was interested in the options assigned by him, and concluding : "B is to hold said options for the joint and equal benefit of A and B. In case B is able to trade for the property, he agrees to give A one-half of the net profits after he has received in full the purchase price, with eight per cent interest on that amount for the time he has held it. The property is not to be sold for less than $175,000 until after May 1, 1887, unless by consent of both A and B :" *Held,* that when B acquired the lots, under the options, he held the title in trust, to reimburse himself for the purchase money and interest thereon, and the balance for himself and A in equal shares, and that this vested an equitable interest in A to the lots.

4. SAME—*merger of contract rights—effect of a subsequent contract in relation to same subject matter, but which is abandoned.* In the same case it appeared that A and B entered into a contract with C in respect of the property, which was based upon the contingency that a hotel company should be organized, with a capital stock of not less than $400,000, and this contract provided that the hotel company should lease the ground from B at an annual rental of $12,000, and taxes and assessments thereon, the lease to run ninety-nine years. Of the rent, three-fourths was to be paid to B and one-fourth to A, so long as B retained the title.

The contract gave C an option to purchase the premises, including the proposed lease thereof, at any time before September 1, 1887, for $205,000, and provided that if C failed to make such purchase, B might sell the same, and pay himself and divide the balance. The hotel company never, in fact, organized, except on paper, and C, the principal promoter, proved insolvent, and no lease was ever made of the property: *Held,* that this tripartite contract having proved abortive from the failure of the enterprise upon which it rested, and being abandoned by all parties, did not have the effect to deprive A of his interest in the lots under the prior contract, and vest the same in B. The latter contract never having taken effect, there was no merger of the prior contract between A and B.

APPEAL from the Superior Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

Messrs. PADDOCK, ALDIS & WRIGHT, and Messrs. KNICKERBOCKER & HOLDOM, for the appellant.

Mr. FREDERICK ULLMANN, for the appellee.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This is a bill filed by appellee, to remove what is assumed to be a cloud upon his title to the land in controversy. The alleged cloud grows out of the recording of a certain agreement between Shirk and Rigdon and one McNeill, bearing date January 21, 1886.

The principal inquiry is, whether the claim of appellant is, in fact, a cloud upon appellee's legal title. A cloud is said to be the semblance of a title, either legal or equitable, or a claim of an interest in lands, appearing in some legal form, but which is, in fact, unfounded, or which it would be inequitable to enforce. If the claim sought to be removed is valid, and may be enforced either at law or in equity, it can not be said to be a cloud. It therefore becomes necessary to inquire into the nature and character of appellant's interest and claim in respect to the land, and whether he has a substantial interest in the same, of which he has been deprived by the decree.

Appellant had acquired from the former owners of the land
options to purchase the same at a fixed price, within a limited
period of time, which options he assigned to appellee, whereby
the latter was enabled to acquire the title to the several tracts
of land at an aggregate price not exceeding $105,000. The
tract of land now owned by Shirk was acquired from a number
of persons, each owning a portion in severalty. The purpose
seems to have been to acquire title to a compact body of land
of the size and dimensions suitable for the erection of a hotel.
The options had been procured from the several owners by
Rigdon, as it seems, before negotiations had opened between
himself and Shirk. At the time of the transfer of the options,
Shirk gave appellant a writing certifying that appellant was
interested in the options so assigned, and that he (Shirk) was
to hold such options for the joint benefit of both parties. This
writing also stipulated that in case Shirk bought the property
under the options, he would give Rigdon one-half of the net
profit derived therefrom, after deducting the full purchase price
paid, with eight per cent interest on the same for the time he
might hold the property, and that it should not be sold at less
than $175,000 before May 1, 1887, unless by consent of both
parties. The options assigned gave the right to the holder to
purchase the several tracts named in said options, at a fixed
price, within the time fixed by the makers of the same. A
contract giving such an option, when fairly made upon suffi-
cient consideration, is valid. When not otherwise provided,
such contract may be assigned, and is of value to the holder,
if it may be enforced, giving him the advantage of any increase
in the value of the property. The question of the legality of
such contract is not involved in this litigation, for the reason
that the makers of the options conveyed the property to Shirk
in accordance with their terms. Appellee, Shirk, having
availed himself of the options, and acquired the title to the
property under them, ought not, at least in a court of equity,
to be excused from the performance of the contract under and

by virtue of which he obtained their assignment. That contract was, that he would hold the options for the joint and equal benefit of himself and appellant, after first deducting the sum expended in the purchase, with interest thereon from the time he should hold the property. Appellee thereby secured to himself the money advanced by him, with interest and one-half the profits, while the compensation to Rigdon was agreed to be one-half of the profits over and above the purchase price and interest.

It is undoubtedly true that the project of the formation of a hotel company which should erect a hotel thereon, taking a lease of the land, was contemplated by both parties, and was no doubt an inducement to the purchase under the options, as well as to their procurement and assignment. Both parties expected, when the options were transferred, that the property, if purchased thereunder, would be leased at a price that would yield a profit over and above the interest reserved upon the purchase money. Provision was, however, made for a disposition of the property in the event of a failure to secure the anticipated leasing thereof. It was not to be sold before the first of May, 1887, for less than $175,000, unless both Rigdon and Shirk consented to such sale, and the profits were, as we have seen, in the event of a sale, whenever made, to be equally divided between Rigdon and Shirk. It was also contemplated by both parties, that in case of the erection of the proposed hotel and the taking of a lease by the hotel company, a sale of the reversion and lease might be made. It was in view of this that the tripartite contract dated January 21, 1886, was entered into between appellee, appellant and Malcolm McNeill. After the purchase by Shirk under the options, a hotel company was incorporated and organized, the capital stock of which was subscribed, but never any of it paid, the project having been abandoned in consequence of the insolvency of the principal promoter.

Before considering the effect of the tripartite agreement, it will be proper to notice, that while the negotiations were pending between Shirk and McNeill, and the hotel company, represented by McNeill, a memorandum was made bearing the same date of the agreement, but in fact executed some days prior, showing the understanding of Shirk and Rigdon of the relations each bore in respect of this property. By that instrument, Shirk agrees with Rigdon that if McNeill takes the benefit of an option given by him to McNeill to purchase the property, describing it, for $205,000, on or before September 1, 1886, he would pay Rigdon $50,000 of this amount. The memorandum or agreement then proceeds: "I am to purchase the property at a price not to exceed $105,000. If McNeill does not purchase the property as above, then Rigdon and Shirk are to sell the property on or before October 1, 1887, at the best price they can obtain for the same, and the amount received over and above $105,000, will be divided equally between Shirk and Rigdon, Rigdon to receive one-fourth of the ground rent until the property is sold.—E. W. Shirk."·

It is conceded that this instrument was made in view of the negotiations with McNeill and others in respect to the erection of a hotel upon the premises, and taking a lease thereof, which it was expected shortly to consummate, and was a private memorandum, temporary in its character. But it is also shown that it was made upon the demand of Rigdon for some kind of writing showing his interest in the property, and which was to be recognized by Shirk. This memorandum, even if intended to be but temporary, until the tripartite contract could be entered into, very clearly shows the understanding of both Shirk and Rigdon in respect of Rigdon's interest in this property. If the tripartite contract had not been made, it is evident that Shirk would have held the property bought by him under these options, first, as a security for the repayment to himself of $105,000 and the interest thereon; and secondly, after that lien was discharged, the balance in trust for himself

and Rigdon, in equal shares. In other words, Shirk and Rigdon would have been, in a sense, partners in the proceeds of the property over and above its cost price, and interest thereon.

As we have seen, by the first agreement entered into between these parties, the property was not to be sold, before a stated period, for less than $175,000. It is evident that a sale was expected to be made to McNeill for $205,000, but if that failed, then the property was to be sold by "Rigdon and Shirk on or before October 1, 1887," at the best price they could get, and Rigdon was to "receive one-fourth of the ground rent until the property was sold." If the property was worth more than $105,000, the cost price, and the interest on that sum at eight per cent until the sale should be made, it is apparent that both parties understood that appellant had an interest in the same to the extent of one-half of such excess.

It is claimed that the tripartite agreement entered into between McNeill, Rigdon and Shirk, dated January 21, 1886, but in fact executed January 30, 1886, supersedes all former agreements between appellee and appellant, and that all prior contracts between them were merged therein, and that such agreement must alone be looked to as fixing the rights of the parties. It is perhaps enough to say that the last agreement referred to was based upon a contingency which never happened. The second clause of that agreement contemplates and provides for the incorporation of the hotel company, with a capital stock of not less than $400,000. The third clause provides that the hotel company thus organized should lease the premises as vacant and unoccupied ground from Shirk, at an annual rental of $12,000, and taxes and assessments levied or assessed thereon, said rental to be payable quarterly in advance, commencing on September 1, 1886, and for a period of ninety-nine years. Of this rent, three-fourths was to be paid to Shirk and one-fourth to Rigdon, so long as Shirk might retain the title to the premises. By the fourth clause, Shirk and Rigdon gave McNeill an option to purchase the

premises, including the lease thereof to the hotel company, at any time before September 1, 1887, for the sum of $205,-000, $50,000 of which was to be paid to Rigdon and the balance to Shirk. McNeill was also authorized to sell the premises, and lease to any other person or persons at a price that would yield Shirk and Rigdon the sum of $205,000. By the fifth clause it was provided that in case McNeill should fail to purchase or make sale of the premises on or before September 1, 1887, then Shirk should be at liberty to sell the same, and the proceeds, over and above the cost price paid by him, to be divided as was provided in the fourth clause.

The hotel company organized on paper only. No subscriptions to the capital stock were ever paid, and no lease of the property was executed as provided for and contemplated in the tripartite agreement. The reason for this, no doubt, was that McNeill, the principal subscriber to the capital stock and promoter of the project, was insolvent. The incorporation of the company was abandoned by all parties. Thus it is seen that the tripartite contract proved abortive from the failure of the enterprise upon which it was predicated. There was nothing left upon which it could operate. It may be said that the fifth clause of such agreement remained operative, which provided for the sale by Shirk upon McNeill's failure to purchase or sell the premises and lease. As we have seen, no lease was executed; the right given to McNeill to purchase was of the reversion, with the lease provided therein to be executed by the hotel company. But if this view is not correct, and the fifth clause of such agreement remains, Shirk was to sell, and the proceeds were to be divided by first paying himself his purchase money, and the residue was to be divided as provided for in the fourth clause of said agreement.

Neither appellant nor appellee seems to have been in any way responsible for the failure to carry into effect the tripartite agreement. Both seem to have done all they could to

prevent the happening of the contingency which rendered the tripartite agreement nugatory. It is not seen upon what principle, if it be found that Rigdon had a valuable interest in the proceeds of this property before the execution of the tripartite agreement, he lost it by the execution of said agreement, or upon which Shirk acquired the interest of Rigdon, or it became extinguished by the entering into of an agreement for lease and sale of the property, which, by the failure of a third party to keep and perform his agreement, was not carried into effect.

By the contract between these parties, Shirk at all times reserved to himself a first lien for the money advanced in the purchase of the property, with interest at eight per cent thereon for the time he might hold the same, while Rigdon's interest related solely to a share of the profits made upon the investment. How has that interest been divested? It is to be remembered that Shirk comes into a court of equity and asks its aid, and, upon the very plainest principles, he should be required to do equity. It is not seen that Rigdon has done any act by which he has lost his interest, nor why, in justice and good conscience, Shirk should not sell the property for the best price attainable, repay himself his money, with interest, and divide the overplus as he agreed to do, and upon the faith of which agreement he acquired the valuable right that Rigdon held in the options under which the purchase by Shirk was consummated. We think that while the claim of Rigdon is for money, or a share of the profits to be made upon a sale of the land, it appearing that the land was acquired by Shirk to be held by him in trust for the benefit of himself and Rigdon in respect of these profits, it is such an interest, in equity, as should not be removed from the legal title of Shirk. Equity demands that Shirk should carry out his contract; the failure to lease to the hotel company or to sell to McNeill by no means discharges the trust upon which he became invested with the legal title.

No question is involved in respect of the decree so far as it affects the defendant McNeill.

It follows that we are of opinion that the decree as to Rigdon was erroneously entered, and must be reversed. The cause is remanded to the court below, for further proceedings not inconsistent with the views here expressed.

*Decree reversed.*

Mr. CHIEF JUSTICE CRAIG: I do not concur with a majority of the court in the decision of this case. I think the prior agreements were merged in the tripartite agreement, and as Rigdon has no right or title in and to the premises under that agreement, I think complainant had the right to have that agreement set aside as a cloud on his title.