**Jack I. LeVANT and May LeVant, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15758.**

United States Court of Appeals Seventh Circuit.

April 18, 1967.

Rehearing Denied June 7, 1967, en banc.

Schnackenberg, Circuit Judge, dissented.

Arthur S. Freeman, Julian L. Berman, S. Richard Fine, Chicago, Ill., for petitioners.

Mitchell Rogovin, Asst. Atty. Gen., Solomon L. Warhaftig, Lee A. Jackson, Harold C. Wilkenfeld, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before MAJOR, Senior Circuit Judge, and SCHNACKENBERG and CUMMINGS, Circuit Judges.

MAJOR, Senior Circuit Judge.

This litigation had its genesis in an employment agreement entered into on April 22, 1957, between Jack I. LeVant (petitioner) and the S. M. Edison Chemi-

cal Company (Edison), by which petitioner claims, among other things, that he was granted an option to purchase up to 20% of Edison, which option was exercisable for a two-year period commencing January 1, 1958. Edison was a sole proprietorship until October 1959, when it transferred its assets to a newly created corporation, Edison, Inc., in exchange for 345, or all of the outstanding, shares of the common stock of that corporation.

During petitioner's employment by Edison, a number of companies displayed interest in acquiring Edison, Inc., including Colgate Palmolive Company (Colgate). The latter, in 1959, agreed to purchase Edison, Inc. for $1,500,000. The agreement provided that the purchase price was to be paid in the form of Colgate stock, valued for purposes of the exchange at $38.50 per share. The acquisition of Edison, Inc. by Colgate was consummated on January 15, 1960, at which time Colgate exchanged its common shares for the interest of Edison and the claimed interest of petitioner in Edison, Inc. Colgate received all of the outstanding shares of the latter. Edison agreed, under circumstances subsequently discussed, that petitioner by reason of the employment agreement of April 22, 1957, had a 20% interest in Edison, Inc. Accordingly, petitioner received in Colgate shares 20% of $1,500,000, as the result of the exchange with Colgate. Because of petitioner's obligation to pay Edison $50,000 at the time he exercised his alleged option, he actually received a net of only $250,000 in Colgate stock (6494 shares), at a pegged price of $38.-50 per share.

Petitioner represented to Colgate that the shares of stock issued to him were to be acquired for investment and not for distribution. This representation was required by Colgate because the shares, while admitted for listing on the New York Stock Exchange, had not been registered with the Securities and Exchange Commission for public sale, as required by the Securities Act of 1933, if they were going to be sold to the public. The investment representation required by

Colgate was to protect it from liability under the Securities Act. The shares which the taxpayer thus acquired were termed "investment letter stock," and although the stock certificates were not stamped in such a manner as to prevent assignment, petitioner was advised by representatives of Colgate that he could not sell the shares at the time and that he should not attempt to do so without first consulting counsel. Petitioner did not sell any of the Colgate stock in less than three years from the time he acquired it. After the acquisition by Colgate of all of the stock in Edison, Inc., petitioner became president of Edison, Inc., and a vice president of Colgate.

Petitioner did not report any income in 1956 or 1957 by reason of the alleged grant of an option to purchase 20% of the business of Edison. For the taxable year 1960, he reported as long term capital gain the amount of $236,828.13 from the sale of a capital asset termed "Option to acquire 20% interest in S. M. Edison Chemical Company," at a gross sales price of $251,573.75.

The Commissioner determined that the amount of $236,828.13 received by petitioner in 1960 was not a long term capital gain but was ordinary income. In doing so, he valued the 6494 shares of Colgate stock at $39$\frac{1}{16}$ per share, less expenses in the amount of $16,843.75, for a taxable gain of $236,828.13.

The Tax Court sustained the determination of the Commissioner, except it found that the fair market value of the 6494 shares of Colgate stock received by petitioner on January 15, 1960, was $34$\frac{3}{8}$ per share. It found a deficiency in income tax for that year in the amount of $96,928.86. It is from this decision of the Tax Court that Jack I. LeVant and May LeVant are here on petition for review. (The latter is petitioner's wife, and joined as a party only because joint returns were filed.)

Petitioner on brief states the contested issues:

"1. Whether the Tax Court correctly concluded that the option LeVant received on April 22, 1957, which was exercisable on and after January 1, 1958, did not represent income to LeVant on either of those days because under Respondent's regulations 1.421–6 the option did not have a 'readily ascertainable fair market value'. Are these regulations of Respondent valid for the purpose of determining the value of an employee's option to which Section 421 of the Internal Revenue Code does not apply?

"2. Whether the Tax Court was correct in determining that the exchange of LeVant's option for Colgate's shares was a taxable transaction under the Internal Revenue Code.

"3. Whether the Tax Court correctly determined the fair market value on January 15, 1960, of the Colgate shares received by LeVant."

Petitioner devotes much effort in support of his contention that the Commissioner's regulations 1.421–6 are invalid in requiring a "readily ascertainable fair market value" of petitioner's alleged option at the time received on April 22, 1957, or January 1, 1958. This argument generally is to the effect that these regulations require a higher degree of proof as to value than is applied in other circumstances. The Commissioner makes no effort to defend these regulations because the Tax Court, while discussing them, based its decision on case law.

In our judgment, the case was tried on the false premise that petitioner was granted or acquired an assignable option on April 22, 1957. Petitioner's contention that he did necessarily encompasses the further contention that it was freely assignable by him. In our view, as we shall subsequently show, he acquired no option but, assuming that he did, it was personal to him and non-assignable.

This conclusion requires consideration of the employment agreement entered into between petitioner and Edison on April 22, 1957. As a prelude thereto, it appears pertinent to state briefly the relationship existing between the parties at the time of the execution of the agreement and prior thereto.

In 1956, petitioner attempted unsuccessfully to buy Edison, which was engaged in the manufacture and sale of pharmaceutical products. He agreed to work for Edison on a trial basis as a consultant for some three months, primarily to determine if the Edison products could be sold profitably on the consumer market. During the three-month period petitioner received a monthly salary of $1,500 and an expense account of $750. Without reciting the details, it is sufficient to note that petitioner from his experience was encouraged and felt that the sale of Edison products could be greatly increased. He decided that he would like to have a share in the business and, on December 26, 1956, he submitted to Edison a written memorandum on the terms he would expect for his continued employment. In the written proposal, referred to as "Proposal of Employment," petitioner offered to work as a director of sales and merchandising for a two-year period; to devote his full time, talent and efforts in the best interest of the company, at a monthly salary of $1,500, plus an expense advance of $750, plus a bonus of 2% of annual net sales of Edison in excess of $300,000. He also suggested an option for a period of five years to purchase up to a 20% interest in Edison.

Edison did not agree to the proposal, and petitioner deemed their relationship terminated. Shortly thereafter, Edison, evidently much impressed with the services which petitioner had rendered, decided that he was needed in the business and in a conversation agreed to give him an option to buy into the business. Petitioner continued to work for Edison without a signed written agreement.

With this background and under these circumstances, Edison on April 22, 1957 wrote petitioner as follows:

"Mr. Jack I. LeVant
2935 Sherwin Avenue
Chicago 45, Illinois
Dear Jack:

Herewith follows the terms of our agreement covering your employment with the S. M. Edison Chemical Company of Chicago:

(1) You are to act as General Manager of the Company in complete charge of sales, merchandising and advertising of all products manufactured by the company for the year commencing January 1, 1957, through December 31, 1957.

(2) You will also lend your assistance and counsel to all matters pertaining to general plant operation and purchasing and generally act in my behalf as requested by me.

(3) In order to assure you the opportunity to make this business profitable, I agree to permit you veto power on expenditures or agreements as concerns advertising promotions, sampling, Executive salaries, other than yours or mine and plant equipment or real estate. In other words you and I will jointly approve or disapprove expenditures.

(4) You and I shall each draw a salary of $18,000.00 per annum. You will continue to have an expense account allowance advance of $750.00 per month with an adjustment at the end of the year covering actual expenses either greater or smaller. I shall have the company reimburse me also for actual business expenses.

(5) In addition to our salaries, we shall divide the net profits before taxes at the end of each year on a 50/50 basis—net profit to be as shown by an audited statement.

(6) As further incentive to employ you, I offer you an option to purchase up to 20% of the S. M. Edison Chemical Company—or its successors—at a cost to you of $50,000. Payment for same to be made as follows: $20,000 in cash and the balance in equal yearly installments at 3% interest. This option shall be yours for a two (2) year period commencing January 1, 1958.

(7) It is understood that all of the foregoing is conditional to my company showing earnings in 1957 sufficient to pay our combined salaries and expenses

for the year 1957. If that develops, I, the company, or its successors, will as part of this agreement offer you a 5 year employment contract on the same terms herein outlined; namely a base salary, expenses, and in addition an equal (50/50) share of the annual profit as well as all the other provisions contained in this agreement, as concerns management, veto powers, and earnings sufficient to provide our combined base salaries and expenses.

(8) A plan for plowing back the profits earned each year after this trial period that is equitable for you, will be submitted between now and year-end, which will apply to your 5 year employment contract.

This covers the basic points of our understanding for your employment. Be assured Jack, that these points shall be incorporated in any contract that may be drawn up between you and I in the future. My signature as sole owner of the S. M. Edison Chemical Company is affixed hereto indicating my acceptance of this agreement. Your signature will be indicative of your acceptance.

Sincerely,
S. M. EDISON,
*President,*
S. M. EDISON CHEMICAL
COMPANY
Jack I. LeVant

. . . . . .

Jack I. LeVant"

This proposal was accepted by petitioner, as indicated by his signature. Thus, the parties had an employment agreement which by its terms was for the period "commencing January 1, 1957, through December 31, 1957" (Par. 1). After setting forth petitioner's duties and authority, the agreement (Par. 4) provided for his salary and expense allowance. In addition, net profits were to be divided equally at the end of each year (Par. 5). The "offer" of an option contained in Par. 6, as well as other provisions, was made on the condition (Par. 7), "It is understood that all of the foregoing is conditional to my company showing earnings in 1957 sufficient to pay our combined salaries and expenses for the year 1957." Admittedly the earnings were insufficient to meet this condition. That Edison regarded this condition as essential is shown by the further provision that if it was met, a five-year employment contract would be offered petitioner on the same terms as set forth in the agreement (Par. 7). That Edison's proposal was tentative is further shown (Par. 8) by a plan for disposition of profits after this "trial period," which was to be submitted before the year end and was to apply to petitioner's five-year employment contract. Also, the statement in the concluding part of the agreement is significant, "Be assured Jack, that these points shall be incorporated in any contract that may be drawn up between you and I in the future."

Petitioner continued his employment with Edison during 1958 and 1959, without any further written agreement concerning the terms and conditions of his employment or his asserted right to acquire a 20% interest in Edison. More than that, he at no time purported to exercise his claimed option by payment of the amount designated or any part thereof.

Was petitioner granted or did he acquire an option to purchase 20% of Edison by reason of the optional proposal contained in the agreement? We think as a matter of law that he did not. He acquired nothing more than a conditional privilege to obtain an option and, when the condition was not met by the end of the agreement year, the privilege terminated.

Assuming, however, contrary to what we think, that petitioner acquired an option in 1957, the next question is whether it was assignable. Petitioner's contention that it was rests on the infirm ground that there was no prohibition against its assignment. This is a non sequitur. It does not follow that because there was no prohibition against assignment, it was assignable. No authority is cited which supports petitioner's claim of assignability.

Volume 91 C.J.S. Vendor & Purchaser § 16, page 870, discusses "Assignment of Option." It states, with the citation of cases, that an option is assignable where "the right secured to the optionee is not intended to be personal to him," or in the absence of a "showing that it was given because of a peculiar trust or confidence reposed in the optionee." It also states that an option is not assignable "where it is given on the personal credit of the optionee, or when granted exclusively to the optionee and no other person." See Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824; Wheeling Creek Gas Coal & Coke Co. v. Elder et al., C.C., 170 F. 215, 221, and In re Estate of Frayser, 401 Ill. 364, 372, 82 N.E.2d 633.

It is difficult to visualize a proposal more personal in nature than that which Edison made in the 1957 agreement. It was made in recognition of petitioner's demonstrated worth to the business and in anticipation of his future efforts. At the hearing petitioner was asked, "And what was the 20 per cent interest for?" and he answered, "To develop that business so it could be a marketable commodity." It is inconceivable that either party had the slightest idea that the option proposed by Edison could be isolated from the employment agreement of which it was a part, bartered at the market place and acquired by a person unknown to Edison and without knowledge of the business which he sought to have developed by petitioner. If that could be done, the entire purpose of the agreement would be thwarted, including the option which was proposed "as a further incentive to employ you."

In view of this conclusion, the issue as to the fair market value of the asserted option becomes moot. However, assuming arguendo that petitioner acquired an assignable option, we hold that it would have no fair market value in the hands of an assignee. We think there is no occasion to discuss the testimony of petitioner's witnesses, properly rejected by the Tax Court, who testified as to the value of the option held by petitioner.

Their testimony is based upon the erroneous premise that petitioner by the 1957 agreement acquired an option which was freely assignable. They admitted that they gave no weight to the employment contract of which the claimed option was a part.

What we have said requires a rejection of petitioner's contention that he realized taxable income upon his acquirement of an option in 1957, that such option had a fair market value and that he was entitled when he disposed of it in 1960 to have the proceeds treated as a long term capital gain rather than as ordinary income.

For petitioner to prevail on this phase of the case it was essential that it be shown that his receipt of the claimed option, rather than the benefit derived therefrom, constituted the payment of compensation to him. For reasons already shown, we agree with the finding of the Tax Court that the acquirement of the claimed option by petitioner did not represent the payment of compensation. The employment agreement of 1957 provided for an annual salary, for a division of profits and a five-year employment contract. It was in this setting that the option was offered "as further incentive to employ you." It is evident, we think, that the offer was made as an inducement to petitioner to utilize his acknowledged ability in developing and expanding the Edison business so that it might become, as it did, attractive to outside interests. His compensation for such effort was realized upon his exchange of his interest for shares of stock in Colgate. In this connection it is of some significance that petitioner in his tax returns for 1957 and 1958 reported no income received as a result of the acquirement of the option.

Petitioner asserts that after 1957, the business "generally" was operated according to the terms of the agreement, and thereby seeks to bolster his contention that he acquired an option to purchase 20% of the business of Edison. The premise is of dubious validity but, even if accepted, it means no more than

that the business was conducted by oral mutual agreement. Such a course of conduct would furnish no support for the claim that an option was acquired in 1957 but, if it did, by the same token it would dispel the contention that such an option was freely assignable. In October 1959, Edison was incorporated and the entire outstanding capital stock of 345 shares was issued to Edison. It is significant that Edison at that time gave no recognition to petitioner's claimed right to acquire 20% of the business.

Shortly after, Edison's incorporation negotiations were commenced with Colgate, which culminated in the acquisition by Colgate of all the outstanding shares of Edison, Inc.

Petitioner was active in the negotiations between Edison and Colgate and claimed a 20% interest in Edison, Inc. by reason of the 1957 agreement. On December 15, 1959, numerous documents pertinent to the closing of the transaction were executed between the parties. Significant is that between Edison and petitioner, in which it was recited, "Whereas, Edison is negotiating with Colgate-Palmolive Company * * * for the exchange of all of the outstanding shares of stock of the Corporation and now owned by Edison, being 345 shares, for 27,344 shares of the common stock of Colgate * * *," and "Whereas, the respective rights and obligations of Edison and LeVant under the provisions of said Exhibit 1 [1957 agreement] have been the subject of dispute between them." It was agreed that simultaneously with Edison entering into an agreement with Colgate, petitioner would enter into an agreement with Colgate for the transfer and assignment by him "of all right, title and interest which he may have under the terms of said Exhibit 1, to purchase a twenty percent (20%) interest in the business of the Corporation * * *." The agreement concluded, "The parties expressly understand and agree that nothing contained in the Agreement shall be taken to admit or imply what rights or obligations any party may have under or by reason of the said Exhibit 1."

It is plain that Colgate as a prerequisite to its entering into an agreement with Edison required that petitioner's claim against the latter, whatever it was, be satisfied. In this context and for this purpose only, Edison entered into the agreement with petitioner by which the latter was to receive Colgate shares in satisfaction of his claimed interest. In the event of Edison's failure to consummate the exchange with Colgate, the agreement between Edison and petitioner was not to be taken as an admission of any rights or obligations which either of the parties had under the 1957 agreement.

In our view, any concession thus made by Edison, with its carefully worded reservation, nullifies the contention that Edison even at that late date recognized that petitioner by reason of the 1957 agreement was granted an option to purchase 20% of Edison's business. This view is fortified by the fact, as already noted, that when his business was incorporated, Edison had all of the shares issued to him, none to petitioner. This development also shows that neither of the parties considered the option proposed by Edison in 1957 as the realization of compensation by petitioner at that time.

■ We think no purpose could be served in prolonging this opinion by citation or discussion of the numerous cases called to our attention. In view of what we have held, it is sufficient to state that Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 and Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, are controlling and that petitioner received taxable income at the time he received the Colgate shares in exchange for his claimed interest in Edison, Inc.

Petitioner also contends that the Tax Court erred in failing to find that his exchange in 1960 of his option for Colgate stock was an exchange in which no gain or loss was recognizable under Secs. 368 and 354 of the Internal Revenue Code. Section 354 provides that no gain or loss shall be recognized on an exchange

of "stock or securities" for other "stock or securities" in a corporate reorganization. Petitioner argues that when his option was exchanged for Colgate shares he was "in effect" exchanging stock in Edison, Inc. for Colgate shares, and that this exchange was non-taxable. Assuming, contrary to what we have held, that petitioner had an option, it was to acquire a 20% interest in an unincorporated business. Assuming further that this gave him an option to acquire 20% of the stock of the corporation formed to take over the business, he did not exercise his claimed option and never acquired any stock of Edison, Inc. (As previously shown, all 345 shares were issued to Edison.) There is no evidence and no claim that petitioner ever notified Edison that he was exercising the option, that he ever paid Edison $50,000, or ever owned any interest in Edison, Inc.

We agree with the Tax Court that petitioner's conveyance to Colgate of the claim which he had against Edison, however it be characterized, was not in substance or otherwise an exchange of Edison shares for those of Colgate. See Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 200, 62 S.Ct. 546, 86 L.Ed. 789.

This brings us to the issue as to the fair market value of the 6494 shares of Colgate stock received by petitioner on January 15, 1960, which the Tax Court found was $34⅜ per share.

It must be kept in mind that this stock, as previously shown, was termed "investment letter stock," designed to prevent its sale for a designated period of time. The sole witness who testified as to value was an investment analyst who without dispute was qualified by training and experience to give such testimony. The Tax Court summarized his testimony as follows:

"The witness testified that because it was investment letter stock, which would prevent petitioner from selling the stock on the open market for a period of 1 to 2 years without violating the Securities Act of 1933 unless there was a bona fide change in circumstances, the value of the Colgate stock received by petitioner should be discounted about 20 percent from the price it was currently selling for on the stock exchange. He based this primarily on an analysis of the cost of 'puts' for various stocks for various periods of time advertised in the newspapers on January 15, 1960. As we understand the gist of the witness' testimony, it was that petitioner would have had to pay a discount of about 20 percent of the current market value of the stock on January 15, 1960, to be assured that he could sell it at that price at that time in the future when it could be sold on the open market without violating the Securities Act. His alternative, outside of violating the law, would be to sell it privately at that time to someone else who would give an investment representation, and he would have to sell it at about a 20-percent discount from current market price in order to make such a sale. In his opinion the investment letter Colgate stock received by petitioner was worth only $31½ per share on January 15, 1960."

Concerning this witness, the Court stated:

"We are inclined to give considerable weight to this uncontradicted evidence, but we must also give consideration to some other factors involved which we think would tend to lessen the discount attributable to the investment representation."

It seems to us that the infirmity of the Court's finding on value is that the "other factors" are either without evidentiary support or are irrelevant. For instance, it stated:

"The Colgate stock was an average or above average quality stock and it should not have been too difficult to find someone who would be willing to hold the stock for several years."

This statement has no evidentiary support. More than that, it is not a proper criterion for determining fair market value. In fact, petitioner's witness testi-

fied that a buyer when found would insist on a discount of 20% and "would have the bargaining on his side."

The Court reasoned:

"Petitioner agreed to a negotiated price tag of $38½ per share for the stock for purposes of determining how many shares of stock he was to receive, knowing that the restriction attached to the stock. The value of the stock for petitioner's purposes was apparently not depressed by the restriction."

We think this reasoning is beside the issue. The fact that petitioner in the Colgate-Edison transaction was willing to accept in exchange for his disputed claim the Colgate shares at $38½ a share, or even that the value for petitioner's purposes was not depressed by the restriction, has no bearing upon the fair market value of such shares. If the Court's reasoning in this respect was sound, it should have fixed the fair market value at $38½ rather than at $34⅜ per share.

We recognize, of course, that the fair market value of property for tax purposes is peculiarly a question of fact and that the Tax Court's finding on such issue must stand if substantially supported. Even so, there must be evidence upon which a finding is based. Tripp v. Commissioner of Internal Revenue, 7 Cir., 327 F.2d 432, 434.

There was no evidence which supports the finding of the Court on the issue of value. The only evidence was that of petitioner's witness, who fixed it at $31.25 per share. We think there is no reasonable basis for the rejection of this evidence and that the Court erred in so doing.

Thus, we agree with the decision of the Tax Court in the main but, in view of what we have held, its decision must be reversed so that it may redetermine petitioner's income tax for the year 1960. It is so ordered.

1. In December 1959, Edison agreed to extend petitioner's option until February 1, 1960.

2. S. M. Edison Chemical Company had a $375 "loss" in 1957. This was because the entire cost of a late 1957 and early

CUMMINGS, Circuit Judge (concurring).

I reach the same conclusion as Judge Major but by a different route. In my view, the April 22, 1957, letter from S. M. Edison to petitioner Jack LeVant gave LeVant a valid, two-year option (exercisable from January 1, 1958 until January 1, 1960) [1] provided that the S. M. Edison Chemical Company could pay the salaries and expenses of Messrs. Edison and LeVant for the year 1957. This condition was apparently met.[2] In Illinois, to obtain an option, the owner of property need merely agree with another person that the latter shall have the right to buy the former's property at a fixed price within a certain time. Whitelaw v. Brady, 3 Ill.2d 583, 588–589, 121 N.E.2d 785 (1954); Keogh v. Peck, 316 Ill. 318, 328, 147 N.E. 266, 38 A.L.R. 1151 (1925). This definition was satisfied by virtue of paragraph 6 of the April 1957 letter.

Unless otherwise provided, option contracts are assignable. Rigdon v. Shirk, 127 Ill. 411, 413, 19 N.E. 698 (1889); Perkins v. Hadsell, 50 Ill. 216, 221 (1869). Nothing in the letter agreement purports to limit petitioner's right to assign his option. Petitioner could have exercised his option and then sold his 20% interest in S. M. Edison Chemical Company to an outsider. Therefore, I fail to see that the option was personal to petitioner. The parties could easily have made the option non-assignable if they had chosen to do so. Cf. Martin v. Graybar Electric Company, 285 F.2d 619 (7th Cir. 1961). Both petitioner and Edison testified that there was no restriction on the option, and the Commissioner does not argue to the contrary. Therefore, like Judge Schnackenberg, I conclude that petitioner did acquire an assignable option.

Petitioner of course had the burden of showing that the option had an

1958 advertising campaign was charged in 1957 for accounting reasons. However, petitioner received $18,000 in salary and $9,000 for expenses in 1957, the full amount provided in the letter agreement.

ascertainable value. He failed to carry this burden. No provision in the April 1957 agreement prevented Edison from removing assets from the business prior to exercise of the option. There was no showing that the option satisfied any reasonable definition of readily ascertainable fair market value, either under the Regulation [3] or indeed prior to the promulgation thereof. Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800; Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591. Under the Regulation and these authorities,[4] the gain realized by petitioner on his exchange of the option for Colgate stock was compensation to him for services rendered and taxable when received in 1960. In my judgment, the Tax Court correctly determined that it was the receipt of the benefit of the option, and not the receipt of the option itself, that constituted additional compensation for his services, so that the fair market value of the Colgate stock constituted ordinary income to him.

In sum, this record does not satisfactorily show the value of the option. Therefore, the entire fair market value of the 6,494 shares of Colgate stock received by petitioner constituted ordinary income to him. I join in Judge Major's opinion remanding this case to the Tax Court for a redetermination of petitioner's income tax for 1960.

SCHNACKENBERG, Circuit Judge (dissenting).

I believe the facts show that Le Vant in 1957 received from Edison employment and an option to buy for $50,000, 20 percent of the S. M. Edison Chemical Company. For his services as an employee Le Vant was to receive a salary and a percentage of the profits, and, when he exercised the option, he was obligated to pay the $50,000 to Edison. Edison's own testimony reveals that Le Vant received

an option and that any dispute between himself and Le Vant was not over the option, but rather over the division of the profits.

 Moreover, the option was assignable, as the testimony of Edison indicates, and there was evidence of the ascertainable fair market value of the option when it was granted.

I would hold that the income realized by Le Vant in 1960, by receipt of the Colgate shares, reduced by the cost of his option, was taxable only as a long-term capital gain.

---

3. Treasury Regulations on Income Tax (1954 Code) Section 1.421–6. The Regulation appears to be a reasonable implementation of the *Smith* and *LoBue* cases, but it is unnecessary to pass on its validity. This opinion does not do so.

4. See also Union Chemical & Materials Corp. v. United States, 296 F.2d 221, 225, 155 Ct.Cl. 540 (1961).