STEWART L. GRILL *et al.*, Plaintiffs-Appellees, *v.* ROY ADAMS *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 83—285

Opinion filed May 1, 1984.

Wayland B. Cedarquist and Stanley K. Feinberg, both of Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for appellants.

Daniel C. Meenan, Barbara J. Vrdolyak, and Nancy M. Barrett, all of Feiwell, Galper & Lasky, Ltd., of Chicago, for appellees.

JUSTICE DOWNING delivered the opinion of the court:

In this action involving a real estate sales contract, the trial court ordered defendants to specifically perform a contract for the sale of their 69% interest in certain real estate and to pay damages based on the value of the remaining fractional interest not owned by them. Defendants contend that: (1) the judgment for specific performance is contrary to law and to the manifest weight of the evidence; and (2) the judgment for money damages is contrary to general principles of law, contrary to the manifest weight of the evidence and is grossly inequitable because: (a) it was a term of the contract that only 69% of the real property interest was being sold; (b) plaintiffs waived the requirement that the 31% interest be conveyed; and (c) plaintiffs' failure to mitigate damages barred recovery of a money judgment.[1]

Defendants Roy, Bruce and William Adams, who are brothers, own a 68.993% (hereinafter referred to as 69%) interest in the Pelouze Building, located at 230 East Ohio Street in Chicago. They hold their interest as beneficiaries of Land Trust No. 30313 at American National Bank. The brothers, who are businessmen, do not reside in Illinois. The office building, currently valued at $1.6 million, is fully occupied with business tenants. The remaining 31.007% (hereinafter 31%) interest is owned by Harris Bank, as trustee for the will of Helen T. Pelouze.

In the spring of 1977, defendants discussed selling the property. Bruce, a California resident, through the suggestion of a local real estate broker, John Martin, became interested in tax-deferred transactions under Interal Revenue Code section 1031. Martin prepared a listing agreement for the real estate at the price of $795,000, dated April 12, 1978, which stated that the deal was to be a 1031 exchange.

---

[1] A third issue, whether the judgment for specific performance is so inconsistent and vague as to be unenforceable, is listed in the "Issues Presented for Review" section of defendants' brief, but is not covered in the "Argument" section. We therefore do not address it. 87 Ill. 2d R. 341(e)(7).

Only defendants were identified as the owners and so signed the agreement. Both Roy and Bruce testified that Martin was informed of the split ownership and that they assumed Martin would obtain the Harris' signature on the listing agreement. Martin contacted a Chicago broker from Arthur Rubloff and Company about the property.

Plaintiffs are Stewart L. Grill, a real estate developer and investor since 1958, and Stuart M. Kaplan, a real estate broker for over 20 years. Plaintiffs were introduced to the transaction by the Rubloff representative. Shortly after expressing an interest, they inspected the property and received the rent roll. Thereafter, their attorney prepared a written offer, dated September 27, 1978, to purchase the parcel for $700,000. The rider attached to the offer referred to the exchange feature of the sale.

A counteroffer prepared by broker Martin at Bruce's direction and dated October 14, contained two alterations to the offer. The purchase price was increased to $775,000 and the following language was inserted:

> "This transaction [is] to be a 1031 Tax Deferred exchange into properties not located in the State of Illinois with closing on or before 1/15/79. Should the up property [the exchange property] not be located by this date it is agreed to extend the closing date in order for the owners of the office building to effect the exchange."

Plaintiffs signed the counteroffer on October 20 and Bruce acknowledged the sellers' acceptance on October 31, 1978. Plaintiffs deposited $35,000 earnest money into escrow and thereafter took steps to secure financing. They also actively participated in the management of the property in accordance with the contact provision that sellers could not make major changes or lease renewals without plaintiffs' approval.

Martin wrote to James Andras, a trust officer handling the Pelouze Trust at Harris Bank, on November 11, 1978, to inform him of defendants' intent to sell the property and that the purchase price of $775,000 included the amount which would represent the value of the Harris' 31% ownership. Roy contacted the beneficiary of the trust in December of 1978 in order to attempt to gain her cooperation.

Kaplan and Grill testified that they did not know precisely when they learned of the complete ownership, but both thought it was after the contract signing. On cross-examination, however, Kaplan stated that he couldn't recall if it was before or after the contract signing. The listing agreement, the offer to purchase, and the counteroffer all indicate that defendants owned the property and no mention was

made of Harris Bank.

Kaplan testified that at the time the contract was executed, defendants were interested in a particular exchange property, but it was not until September 15, 1979, that the parties entered into an exchange agreement involving the Reatta Shopping Center near Houston, Texas. In this document, Harris was identified as one of the title holders to the property, and defendants declared that they had secured a written proposal from Harris to sell its proportionate share in the Pelouze Building for $240,000. Kaplan stated that the parties worked out an understanding with Harris wherein plaintiffs would increase the sales price and the brokers would reduce their fees so that Harris obtained the sum of money it desired for its interest. The exchange amount reflected a new sales price of $779,705. Harris was not a party to the exchange agreement.

Defendants testified they understood that the current mortgage on the Reatta property was assumable at the rate of $9^3/_4\%$. Thereafter defendants were notified by the Reatta lender that the loan could not be assumed and the new interest rate would be 12%. Defendants testified that they then explored other methods of financing, but none were feasible. The Reatta exchange contract was therefore abandoned. The exchange agreement provided that in the event that the mortgagee and/or note holder changed the terms and conditions of the note, defendants had the right to terminate the contract.

The only specification placed on the exchange property by defendants in the original contract was that it not be Illinois property. Roy testified that after the Reatta deal fell through, he continued to review paperwork on additional properties, but that because of the interest climate at the time, "there was absolutely nothing that fit the perameters [sic]." He further stated that rising interest rates stopped the Reatta deal "and any other deal that came down the line." Roy and Bruce testified that Martin continued to send them profiles of possible exchange properties through 1980. Kaplan stated he sent listings to defendants' attorney, although he wasn't sure if it was before or after Reatta, and a Houston broker also continued to submit prospects to defendants through the summer of 1980.

Plaintiffs filed this lawsuit in August 1980 requesting that the court direct defendants to specifically perform the contract by conveying "100 percent of the beneficial interest" in American National Bank Trust No. 30313 (count I); and, that the court enter judgment in an amount in excess of $800,000 for damages which plaintiffs suffered as a result of defendants' conduct (count II). After the suit was initiated, defendants notified plaintiffs that they had terminated the

agreement.

Following a bench trial, judgment was entered on behalf of plaintiffs based upon the court's findings that: plaintiffs did not know of defendants' lack of total ownership in the property prior to the execution of the real estate contract; defendants failed to exercise reasonable efforts to find an exchange property; plaintiffs have fully performed their obligations under the contract; and defendants, by their conduct, waived their right to select and tender an exchange property. The court held that the contract was valid and specifically enforceable to the extent that defendants own the property, and therefore defendants were ordered to convey their interest in the property to plaintiffs and, further, to pay the amount of $225,907.75, plus costs. The amount of damages was computed to be the pro-rata difference between the present market value of the remaining 31% interest in the property and the portion of the purchase price attributable to that percentage. Defendants now appeal from that judgment.

I

Defendants contend that the trial court's judgment for specific performance is contrary to law and to the manifest weight of the evidence. The offer to purchase, drafted by plaintiffs, contained the language that "if seller cannot close by December 1, 1978 because it is attempting to effect an exchange of properties, then closing shall occur on March 1, 1979. Purchaser reserves the right to effect an exchange at closing." The counteroffer, drafted by defendants, stated only that the exchange property not be situated in Illinois and that if such property was not located by January 15, 1979, it was agreed that the closing date be extended so that the sellers could effect the exchange.

The parties and the trial court characterized the location and designation of the exchange property as a condition precedent of the contract. A condition precedent "must be performed before a contract becomes effective or *** is to be performed by one party to an existing contract before the other party is obligated to perform [citation]." (*In re Estate of Albrecht* (1975), 27 Ill. App. 3d 839, 841, 327 N.E.2d 317.) If the condition is not satisfied, the obligations of the parties end. (*Lyntel Products, Inc. v. Alcan Aluminium Corp.* (1981), 107 Ill. App. 3d 176, 180, 437 N.E.2d 653; see J. Calamari & J. Perillo, Contracts sec. 11—3, at 384 (2d ed. 1977).) Defendants reason that because no suitable exchange property was found, further contractual obligations were discharged, and cite *John J. Calnan Co. v. Talsma Builders, Inc.* (1979), 77 Ill. App. 3d 221, 395 N.E.2d 1076. In that

case, a plumbing subcontractor brought suit against the general contractor for rescission of a contract which imposed a condition precedent upon the sub which he never performed. The court noted that because of the sub's failure to comply with the condition, the general's duty to pay him never ripened. 77 Ill. App. 3d 221, 225.

■■ In the instant case, defendants are attempting to use their own noncompliance with a condition, inserted into the contract for their benefit, as the justification for concluding that the parties' contractual duties never ripened. This condition, however, was in the sole control of defendants. The only requirement which they placed in the contract regarding the exchange property was that it could not be located in Illinois. An examination of the record reveals that defendants' main concern, and their reason for not obtaining a suitable property, was the increasing rate of interest. Therefore, the conclusions by the trial court that defendants did not use reasonable efforts to secure an exchange property was not against the weight of the evidence. It is true the exchange agreement for the Reatta property was conditioned upon the defendants' ability to finance the purchase on a mortgage with a 9¾% rate of interest. The fact that the lender demanded 12% would justify defendants in not proceeding with the Reatta exchange agreement. However, that development did not invalidate the parties' agreement or defendants' duty to use reasonable efforts to locate other exchange property. Further, as discussed below, the trial court's conclusions were not contrary to law.

■■ Where the obligation of one party is subject to the occurrence of a condition precedent, the duty of good faith and fair dealing is imposed upon that party (Restatement (Second) of Contracts sec. 205, Explanatory Notes to sec. 245, comment a, at 258 (1981).) A party cannot take advantage of his own conduct and claim that failure of the fulfillment of a condition therefore defeats his liability. (*Yale Development Co. v. Oak Park Trust & Savings Bank* (1975), 26 Ill. App. 3d 1015, 1020, 325 N.E.2d 418.) When a condition attached to a contract is waived by the parties' conduct, performance of the duty that was originally subject to its occurrence then becomes due. (Restatement (Second) of Contracts sec. 245 (1981).) Applying these principles to defendants' conduct in the case at hand, we conclude that the trial court's ruling was not contrary to law. We further note that the remedy of specific performance is appropriate for the portion of a contract which provides for an exchange of properties. (*Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 975, 326 N.E.2d 773, *appeal denied* (1975), 60 Ill. 2d 602.) The grant of this relief rests in the sound discretion of the trial court and is to

be determined from the facts and circumstances of each particular case. (*Bailey v. Meador* (1980), 91 Ill. App. 3d 143, 147, 414 N.E.2d 279.) We find no error in the trial court's action.

## II

■ Defendants next argue that the trial court's judgment in favor of plaintiffs for money damages in the amount of $225,907.75 is contrary to general principles of law, contrary to the manifest weight of the evidence, and is grossly inequitable for the reasons specified below.

Initially, defendants contend that all plaintiffs sought in this litigation was title to the 69% interest in the property which defendants own. Defendants note that no mention was made anywhere in the pleadings of the 31% interest owned by Harris. This lawsuit, however, was solely initiated against the Adams brothers, who were the only parties contractually obligated to plaintiffs. Specific performance could not be obtained against defendants for that property interest which they did not own. Therefore, plaintiffs' request for money damages for the portion defendants could not convey was proper.

Defendants also complain that count II of plaintiffs' second amended complaint only requests damages in the event that specific performance was denied. There is no indication in the complaint that plaintiffs intended the two remedies to be mutually exclusive; rather, plaintiffs were requesting both specific performance and damages against defendants. This request was proper, as it has been recognized by Illinois courts that a purchaser who "entered into the contract in ignorance of the vendor's incapacity to give him the whole *** is generally entitled to have the contract specifically performed so far as the vendor is able, and to have an abatement out of the purchase money for any deficiency in title, quantity or quality of the estate. This rule applies *** in [the] case where the vendor holds an aliquot part of the land agreed to be conveyed and has contracted to convey the whole." (*Baker v. Puffer* (1921), 299 Ill. 486, 492, 132 N.E. 429; see also *Schiro v. W. E. Gould & Co.* (1960), 18 Ill. 2d 538, 546, 165 N.E.2d 286; 5A Corbin on Contracts sec. 1160, at 188 (1964).) We note that, as one case has suggested, because an order of specific performance in effect erases the breach of contract, the money award being sought should really be considered as equitable compensation in the nature of an accounting between the parties rather than as legal damages. (*Arnold v. Leahy Home Building Co.* (1981), 95 Ill. App. 3d 501, 509, 420 N.E.2d 699.) Whether the relief sought is termed as damages, equitable compensation, or an abate-

ment of the purchase price, we conclude that plaintiffs were justified in seeking this remedy.

## A

Defendants argue that plaintiffs knew that the Adams brothers were only selling 69% of the interest in the Pelouze Building and that this was a term of the contract. The record does not support this conclusion. Our review of the negotiations leading to the execution of the original sales contract leads us to conclude that plaintiffs believed that defendants were going to convey to them title to the entire real estate. The contract language does not indicate a contrary intention. Throughout the negotiations, even after it was clear that plaintiffs knew of the fractional ownership, the parties' behavior indicates that the original sales offer included 100% of the property interest in the building. (For example, Martin's letter to Harris one month after the contract signing stated that defendants intended to purchase the Harris' share and that the $775,000 purchase price was for the entire building.)

In Illinois, the grantor of real estate need not have title to the property at the time the contract is made; it is the promise to convey title which is the basis of the contract. (*Crum v. Krol* (1981), 99 Ill. App. 3d 651, 656, 425 N.E.2d 1081.) Therefore, defendants' promise to convey title to the entire real estate forms the basis of the contract and the trial court's order reflecting this obligation was correct.

## B

Defendants further contend that evidence in the record shows that even if the contract did obligate them to convey the Harris' interest, plaintiffs waived this requirement. Defendants reason that because the exchange agreement specifically provided for the conveyance of the Harris portion, once that agreement was abandoned defendants were no longer bound to deed Harris' share.

We do not agree with this interpretation of the facts. By entering into the exchange agreement, the parties did not void their underlying contractual obligations arising from the sale contract, a position admitted by Roy at trial. (See *Rigdon v. Shirk* (1889), 127 Ill. 411, 416-18, 19 N.E. 698.) Defendants have cited no authority in support of their contention and we find no merit to it.

## C

Lastly, defendants attempt to convince this court that the

judgment rendered by the trial court was erroneous because plaintiffs did not, on their own, attempt to purchase the Harris' 31% interest, and thus the money judgment should be barred for failure to mitigate damages. We do not agree.

Under the theory of mitigation of damages, an injured party is not allowed to recover from a wrongdoer those damages which the party should have foreseen and "could have avoided without undue risk, burden or humiliation." (Restatement (Second) of Contracts sec. 350(1) (1981); see also J. Calamari & J. Perillo, Contracts sec. 14-15, at 538 (2d ed. 1977).) In this case, plaintiffs never had a contractual duty to obtain Harris' cooperation and no duty to do so should be imposed on them. Under such circumstances, they should not be penalized for failing to attempt to purchase the 31% interest. Plaintiffs were therefore not barred from money damages (also called equitable compensation or an abatement of the purchase price) under this theory.

For the reasons stated above, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.