In re X–CEL, INC., d/b/a Sizzler
Family Steak House, Debtor.

No. 86 C 6878.

United States District Court,
N.D. Illinois, E.D.

April 20, 1987.

See also, D.C., 68 B.R. 131.

Sharon P. Riley, Levit & Mason, Glen R. Heyman, Chicago, Ill., for debtor-appellant.

David P. Liebowitz, Shcwartz Cooper Kolb & Gaynor, Chicago, Ill., for creditors-appellee.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Debtor-appellant X–Cel, Inc. ("X–Cel") appeals an order of the bankruptcy judge allowing in full, with interest, a disputed

claim under a Chapter 11 reorganization plan made by creditor-appellee A. Eicoff & Co. ("Eicoff"). *In re X–Cel, Inc.*, No. 82 B 6430 (Bankr.N.D.Ill. June 10, 1986) ("Order"). For the reasons that follow, the Order of the bankruptcy judge is affirmed in part and reversed in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We will attempt to briefly recount the facts underlying this dispute as they relate to the present appeal. The claim in issue is for expenses incurred by Eicoff in providing advertising services to X–Cel and three other Chicago area franchisees of Sizzler Restaurants International, the company behind the Sizzler Steak House chain. On or about August 31, 1981, X–Cel and the other franchisees entered into an advertising agreement with Eicoff which provided that Eicoff would act as an agent for the group in purchasing television time for Sizzler commercials. The agreement provided that each franchisee bear the proportion of the expenses equivalent to the percentage of Chicago area Sizzler restaurants it owned, a term which left X–Cel with forty percent of the expenses for each advertising buy.

While there is no dispute over any of the advertising purchased and paid for in 1981, X–Cel claims that despite its protests Eicoff purchased advertising time in early 1982 without first obtaining monthly written authorizations from the four franchisees as required by the advertising agreement. The bankruptcy judge, however, found that all went well through the early part of 1982, and that any complaints made by X–Cel's president, Roy Siemieniak, were not of substance. Order at 2, 4. Rather, the bankruptcy court found that the parties to the agreement regularly met with each other to decide what copy should run, in what medium and at what cost. Order at 2.

By May 1982, X–Cel apparently still had not paid Eicoff for advertising costs and commissions for the period from January 1, 1982 to March 31, 1982. Somewhere around May 21, 1982, Siemieniak sent Eicoff a check for $20,008.48 to cover these expenses, and Eicoff received the check on May 24, 1982. Order at 3. Having received the delinquent payment on X–Cel's account, Eicoff proceeded to purchase a summer advertising plan for the francisees which involved promotion of a "steak and all you can eat shrimp" deal ("the summer campaign"). Siemieniak, however, soon discovered that an involuntary bankruptcy petition had been filed against X–Cel on May 17, 1982. On the afternoon of May 24, Siemieniak telephoned Eicoff's president, Ronald Bilwas, to inform him that he was going to stop payment on the check because of the petition. In the same conversation, Siemieniak declared that he was cancelling the advertising agreement because of Eicoff's purported breach of the promise to submit written purchase orders in advance of the advertising buys. *Id.* Siemieniak sent a letter confirming these statements on the next day. Although not set forth in the bankruptcy judge's Order, the fact that X–Cel's share of the January 1, 1982 through March 31, 1982 costs and commissions under the agreement was later paid to Eicoff from an escrow account is not disputed by either party. Thus, the disputed claim here involves advertising expenses for the period between April 1, 1982 and sometime in September 1982 (when the two parties entered into a new advertising agreement not relevant to this case).

Despite X–Cel's purported cancellation of the contract, Eicoff proceeded with the summer campaign after consulting Dennis Robertson, president of one of the other franchisees, who apparently wanted to go forward with the advertising campaign. X–Cel converted the involuntary petition into a Chapter 11 reorganization in July 1982 and continued to operate its franchises during the summer of 1982 as a debtor in possession. Following confirmation of the reorganization plan, the bankruptcy court dealt with the disputed claims. On October 27, 1983 and November 2, 1983, the bankruptcy judge held hearings at which evidence was presented on Eicoff's disputed claim for X–Cel's share of the advertising expenses for the summer campaign. On February 29, 1984, the court entered an order adopting the proposed

findings submitted by Eicoff and allowing Eicoff's claim in full in the amount of $158,401.42 plus interest at $65.73 per day from and after December 1, 1983 ("the 1984 order").

This particular dispute is before us for the second time for a review of the factual findings and conclusions of law by Bankruptcy Judge Charles B. McCormick. This Court's earlier opinion, *In re X–Cel, Inc.*, 46 B.R. 202 (N.D.Ill.1984) ("*X–Cel I*"), affirmed the 1984 order, but was vacated and remanded by the Seventh Circuit based on that court's finding that the bankruptcy judge's adoption of Eicoff's proposed statement of facts provided an incomplete and inappropriate basis for appellate scrutiny. *In re X–Cel, Inc.*, 776 F.2d 130, 134 (7th Cir.1985) ("*X–Cel II*"). Following the Seventh Circuit's mandate, this Court entered an order remanding this case to the bankruptcy court for new findings of fact and conclusions of law, which the bankruptcy judge issued on June 10, 1986. The Order reached the same result as the 1984 order, but despite the Seventh Circuit's remonstrations, the bankruptcy judge laid out its findings in a six-page narrative rather than in the more familiar format setting forth separately numbered findings of fact and conclusions of law. Nonetheless, we believe the Order, unlike the original 1984 order, provides a sufficient basis for appellate review, and we proceed to the merits on that assumption.

In this appeal, X–Cel argues that three factual findings of the bankruptcy court were clearly erroneous and that four separate conclusions of law should be reversed. The purportedly erroneous factual findings are:

1. "[A]ll went well among the parties through the first part of 1982.... Siemieniak made little, if any, complaint (none of substance) as to Eicoff's performance until the check episode and the bankruptcy filing in May, 1982." Order at 2, 4;
2. Siemieniak's testimony regarding his reasons for stopping payment on the $20,008.48 check was "somewhat incredulous ... [because] [i]t supposes that Siemieniak, just having gained awareness of the bankruptcy, happened upon the technicalities of the law governing preferential transfers." Order at 3;
3. Siemieniak was "deliberately and continually unresponsive and argumentative even in areas so basic to his business that he surely would have been acquainted with a direct response." Order at 5.

In addition to these asserted factual errors, X–Cel argues that the following legal conclusions made by the bankruptcy court should be reversed by this Court in its de novo review of the law. *In re Martin*, 761 F.2d 472, 474 (8th Cir.1985).

1. Eicoff did not materially breach the agreement by failing to obtain specific written authorization prior to each month's advertising purchase and any variance from that practice was undertaken with the knowledge and participation of X–Cel. Order at 5;
2. X–Cel did not have the authority under the agreement to unilaterally cancel the obligations therein. Order at 5;
3. Eicoff was not required to mitigate any of its damages;[1]
4. Eicoff was entitled to interest on its claim. Order at 6.

In addition to disputing all of these arguments, Eicoff contends on appeal that even if the bankruptcy judge erred in the above findings, Eicoff is entitled to recover its claim in full on the theory of quantum meruit. Because we find that Eicoff's claim should be allowed under the contract itself, we need not reach its equitable claim for relief.

## II. BANKRUPTCY COURT'S FACTUAL FINDINGS

In reviewing the bankruptcy judge's factual findings, we may set aside only those findings which are "clearly erroneous."

---

1. The bankruptcy judge did not expressly conclude that Eicoff was under no duty to mitigate, although that conclusion is implicit in his Order allowing Eicoff's claim in full. Nonetheless, X–Cel did raise mitigation before the bankruptcy court and has not waived it for the purpose of this appeal.

Fed.R.Bankr.P. 8013;[2] *X–Cel II,* 776 F.2d at 133 & n. 2 (7th Cir.1985). Based on our review of the transcript and record of the proceedings in the bankruptcy court, we conclude that the court's findings were not clearly erroneous.

Turning first to the court's finding that "all went well" through the first part of 1982 and that Siemieniak's complaints, if any, were not of substance, the Court holds that this finding was well within the realm of the bankruptcy judge's authority given the factual record before him. X–Cel argues that Siemieniak continually complained to Eicoff regarding the latter's purchase of advertising time without prior written approval throughout the beginning of 1982. The legal relevance of this factual account is with respect to X–Cel's argument that Paragraph III of the advertising agreement requires prior written authorization from the franchisees before Eicoff can purchase each month's advertising time and that the bankruptcy judge incorrectly concluded that any deviation from this requirement was with X–Cel's cooperation.

The only evidence supporting X–Cel's version of the facts is Siemieniak's disputed testimony that he registered complaints, to which the bankruptcy judge lent little credence, and Exhibit 24, a letter from Siemieniak to Eicoff dated April 13, 1982. That letter does not refer at any time to Paragraph III or any other part of the agreement. Furthermore, it is not framed as a complaint, but uses language such as "I want to suggest that we adhere to the following approach." In addition, the letter discusses the type of billing procedure being used by Eicoff rather than a contractual requirement of prior written authorization for advertising buys. Moreover, it implies that at the time of the letter Eicoff was authorized to purchase advertising up until July 1, 1982. Given the extent and nature of evidence supporting the bankruptcy judge's findings on this aspect of the underlying events, we cannot find that the judge was clearly erroneous in his con-

clusion that no complaint of any substance regarding the lack of prior written authorization arose until the end of May 1982.

There is little evidence at all with respect to the next disputed factual finding. The judge concluded after listening to the testimony that Siemieniak's contention that he stopped payment on his check on May 24, 1982, to avoid a preference to Eicoff over other creditors was incredulous. We do not share the bankruptcy judge's view that, in the abstract, Siemieniak offered an unreasonable rationale for his acts. Furthermore, aside from Siemieniak's testimony there is no direct evidence in the record regarding his motivations. Nonetheless, it is also true that the bankruptcy judge found Siemieniak to have very little credibility (see discussion below), a determination which it would be inappropriate for this Court to disturb. Accordingly, we hold that the bankruptcy judge's finding on this point is not clearly erroneous. We add that even if it were erroneous, X–Cel's motivation for stopping payment on the check has no real bearing on any of the legal issues in this appeal. Even if it stopped payment to avoid a preference to Eicoff (which we note would have been voidable under 11 U.S.C. § 547 in any event), it still failed to make payments on the contract and therefore breached its obligation, assuming that it could not unilaterally cancel the contract (as we discuss below, it could not).

Finally, X–Cel asks this Court to review the bankruptcy judge's determination that Siemieniak was deliberately and continually unresponsive and argumentative in his testimony. This is precisely the type of finding which is inappropriate for appellate review. This Court did not hear the testimony, but must rely on a cold transcript to review the bankruptcy judge's findings. A transcript cannot reveal the tone of voice or the emphasis on particular words which would suggest an argumentative response. The bankruptcy judge, in contrast, sat through and personally observed Siemien-

2. That rule states in pertinent part:
   Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

iak's testimony and concluded in the end that it was not credible. We must respect that determination if we are to adhere to our responsibility to provide properly deferential appellate review of the bankruptcy proceedings. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Because this Court cannot appropriately review Siemieniak's demeanor on appeal, we hold that the bankruptcy court was not clearly erroneous in its conclusion as to Siemieniak's low credibility as manifested in part by his lack of responsiveness and argumentative tone.

## III. BANKRUPTCY COURT'S LEGAL CONCLUSIONS

Our next task is to review the legal findings of the bankruptcy court, which held that: (1) Eicoff had not breached the agreement with X–Cel; (2) X–Cel did not have the legal authority to cancel the contract without the approval of the other franchisees; (3) Eicoff was not required to cancel the purchase of the summer advertising time in order to mitigate its damages from X–Cel's breach; and (4) Eicoff was entitled to interest on the debt as part of its allowed claim. As we elaborate below, we affirm all of the findings except the one allowing interest on the debt.

### A. *Eicoff's Alleged Breach of the Agreement*

X–Cel's primary argument both in the bankruptcy court and on this appeal is that Eicoff continually breached the terms of the advertising agreement which restricted it from purchasing each month's advertising time until it first received written authorization for the amount of the purchase from the franchisees. As discussed above, the factual findings of the bankruptcy judge regarding X–Cel's purported protests (through Siemieniak) regarding this practice might have been relevant to this legal argument had we found them to be erroneous. Nonetheless, even aside from those factual arguments, we find that the terms

of the contract did not require Eicoff to wait for written approval prior to purchasing advertising time for the franchisees.

■ The relevant term of the agreement is Paragraph III, which states in pertinent part:

All orders for placement of advertising which you [the franchisees] request to be run during any calendar month, shall be delivered to us [Eicoff], in writing, prior to the first day of such calendar month, designating the aggregate amount, in dollars (exclusive of our compensation) to be spent for advertising during the following calendar month and we will endeavor to purchase such time on your behalf and to have such commercials run in accordance with your request. Each written order shall be signed by and on behalf of each of Ellis & Robertson, X–Cel, Inc., and T–B, Inc. and *we shall have no obligation to execute the order unless all three signatures appear thereon.*[3]

(Emphasis added). The bankruptcy judge found that Eicoff satisfied its obligation for services under the contract and that any deviation from the prior written approval practice took place with the complicity of X–Cel and the other franchisees. Order at 5.

■ At the bankruptcy hearing, Bliwas testified that the intent of Paragraph III was to protect Eicoff from incurring unauthorized expenses. At the outset, we note that this explanation appears to be consistent with the express language of the agreement as quoted above which declares that *Eicoff* shall have "no obligation" to purchase the advertising without the written authorization of the franchisees. Moreover, as the bankruptcy court found, and as we agreed in our earlier opinion in this case, the record reveals that all parties to the agreement regularly bypassed the written authorization provision, that they met on a regular basis to plan future advertising and that the franchisees orally approved the advertisements at these meet-

**3.** The record indicates that one of these franchisees had the authority to sign for SLMP, Inc., the fourth franchisee.

ings. Order at 4–5; *X–Cel I,* 46 B.R. at 205, *rev'd on other grounds,* 776 F.2d 130 (7th Cir.1985). Under Illinois law, a party to a contract may waive performance of certain terms if the facts and circumstances show an intentional relinquishment of a known right and that the party's conduct is inconsistent with an intention to insist on its rights under the contract. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 719 F.2d 1335, 1343 (7th Cir. 1983). The party "may waive a condition precedent to performance on his part or a breach of the contract provisions by conduct manifesting a continued recognition of the contract's existence after learning of the breach thereof." *Id.* The bankruptcy judge's findings regarding the conduct of the parties, in conjunction with our previous ruling affirming the factual finding that X–Cel did not make any complaints of substance regarding this practice until the inception of bankruptcy, support the original holding in this case that any right which X–Cel might have had to require written authorization prior to Eicoff's advertising buys was waived.

### B. *X–Cel's Power to Terminate the Agreement*

X–Cel also argues that even if Eicoff did not breach the agreement, X–Cel had the independent right to cancel the contract with respect to its share of the advertising expenses. The bankruptcy judge held that any attempts made by Siemieniak to unilaterally cancel the contract were contrary to the provisions of the contract and consequently had no effect. We agree.

█ The contract's termination clause provides: "This agreement shall become effective immediately and, unless terminated *by either of us* upon not less than thirty (30) days written notice or by us, in accordance with Paragraph VII, shall continue indefinitely." Paragraph III (emphasis added). As we held in our earlier opinion, the phrase "either of us" strongly supports Eicoff's argument that the contract required the franchisees to act as a group in dealing with Eicoff. *X–Cel I,* 46 B.R. at 205. X–Cel, however, relies on Paragraph V of the agreement which states: "During 1981 and 1982, your obligation to us [Eicoff], as between the four of you, shall be several...." X–Cel argues that these provisions are inconsistent and render the cancellation terms ambiguous. Furthermore, X–Cel argues that even if there is, as Eicoff argues, extrinsic evidence regarding the parties' conduct which supports Eicoff's construction, this Court cannot consider that on this appeal because the bankruptcy judge's Order did not explicitly rely on such evidence.

In its earlier opinion, this Court never expressly held that the contract terms in question were ambiguous or that they conflicted. Rather, we held that *to the extent* that Paragraph V rendered the termination clause in Paragraph III ambiguous, the bankruptcy court properly considered extrinsic evidence. *X–Cel I,* 46 B.R. at 205. Now, faced with an appeal of the legal holding that the contract expressly prohibited X–Cel's unilateral termination of the advertising agreement, we hold that the termination clause is not ambiguous on its face and is not rendered so by Paragraph V. A contract is not ambiguous as a matter of law if it is not reasonably susceptible of more than one meaning. *Pioneer Trust & Savings Bank v. Lucky Stores, Inc.,* 91 Ill.App.3d 573, 575, 47 Ill.Dec. 36, 38, 414 N.E.2d 1152, 1154 (1st Dist.1980). The termination clause specifically dictates that the contract may be terminated by "either of us." Use of the pronoun "either" in this context makes it clear that the choice presented in this part of the contract was between one party or the other. *See Webster's Third New International Dictionary* (1976). Had each individual franchisee had the authority to terminate the contract without approval of the other franchisees, the termination clause would have said that the contract could be terminated by "any" of us. Accordingly, we find that the plain and unambiguous meaning of Paragraph III is that either Eicoff could cancel the contract on appropriate notice or the four franchisees acting together could do so.

The clarity of this provision is not clouded by the term regarding the franchisees'

several obligations under the contract in Paragraph V. This provision merely protected each franchisee from being obligated to Eicoff for expenses attributable to any of the others. Immediately following this provision in the contract is an allocation of the percentage of expenses to be borne by each franchisee. Nothing in this provision overtly conflicts with the termination clause, and thus, we do not find the latter to be rendered ambiguous by a conflicting clause. Accordingly, we affirm the bankruptcy judge's ruling that X–Cel's attempts to unilaterally cancel the contract were of no effect because the participation of all franchisees was necessary to do so.

### C. *Eicoff's Duty to Mitigate*

■ X–Cel's next ground for appeal is that even if Eicoff was not in breach and X–Cel did breach the contract, Eicoff was under an obligation to cancel the purchased advertising time for the summer campaign once X–Cel made it clear that it would no longer pay for its share. This point was not explicitly addressed by the bankruptcy judge, but X–Cel presented the mitigation issue in its proposed conclusions of law. We can reasonably infer that by allowing Eicoff's claim in full the bankruptcy judge did not consider mitigation as a factor in his decision. We need not toil very long with X–Cel's contention that Eicoff was required to mitigate. It is clear from the record that the other franchisees wanted the campaign to continue. Thus, Eicoff was confronted with a difficult choice—it could have breached its agreement with the other three franchisees and face a lawsuit from them or it could have continued the entire campaign at the risk of losing the forty percent share of the expenses it was supposed to receive from X–Cel. While it is a basic principle that a party who has been wronged under a contractual agreement may not recover damages which could have been foreseen and could have been avoided without undue risk, burden or limitation, that party need only take those steps which are *reasonable* to avoid such damages. *Restatement (Second) of Contracts* § 350(1) (1981); *Grill v. Adams*, 123 Ill.App.3d 913, 921, 79 Ill.Dec. 342, 348, 463 N.E.2d 896, 902 (1st Dist.1984). In our view, cancellation of the summer campaign would not have been a reasonable act for Eicoff to undertake in mitigation of X–Cel's breach in light of Eicoff's continuing obligation to the other franchisees. Accordingly, we affirm this part of the Order.

### D. *Eicoff's Entitlement to Interest on the Claim*

■ Finally, we address the allowance of interest on Eicoff's claim for advertising expenses. The bankruptcy court, without discussion, allowed Eicoff's claim in full with interest "due and earned." Order at 6. In the 1984 order, the bankruptcy judge had specified allowable interest at $65.73 per day from and after December 1, 1983. The terms of the advertising contract did provide for interest on past due payments, Paragraph V, and nothing in the Chapter 11 reorganization plan approved by the bankruptcy court precludes payment of interest. In our earlier opinion, we read Article II of the plan to explicitly allow for interest through its title, "CLAIMS AND INTEREST NOT IMPAIRED UNDER THE PLAN." Upon further consideration, we view that language as a simple reference to claims and *interests* under the plan as defined in the bankruptcy statute, 11 U.S.C. § 1111 (1982). As stated there, the phrase "claims and interest" merely refers to the claims and interests of creditors under a plan which might be impaired by its approval, and not to interest on an outstanding debt. Disclosure of such claims and interests is regularly included in Chapter 11 plans. More importantly, a statutory provision overlooked by X–Cel, Eicoff and the bankruptcy judge expressly prohibits the allowance of post-petition interest on claims. 11 U.S.C. § 502(b)(2) (1982). That provision states that, with exceptions not relevant here, if an objection to a claim under § 501 is made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, *except* to the extent that—... (2) such claim is for unmatured interest. *Id.* (Emphasis added). Unma-

tured interest is defined in this context as interest which was not yet due and payable at the time the petition was filed. *In re Joyce,* 41 B.R. 249, 255 (Bankr.E.D.Pa. 1984). Accordingly, to the extent that the bankruptcy judge's Order allows for interest on Eicoff's claims for any time after May 17, 1982, we reverse the Order and remand this dispute to the bankruptcy court for a determination of the amount of interest due, if any, on X–Cel's debt at the time the original involuntary bankruptcy petition was filed.

### IV. CONCLUSION

For the reasons set forth in this opinion, we find that the factual findings of the bankruptcy judge were not clearly erroneous under the standards set forth in Fed.R. Bankr.P. 8013. Furthermore, we affirm all legal conclusions of the bankruptcy court with the exception of the ruling allowing interest on Eicoff's claim past the date X–Cel entered bankruptcy. To the extent that the bankruptcy court's Order allowed such post-petition interest, it is reversed and remanded for a redetermination of the precise amount of interest allowable under the limitations of 11 U.S.C. § 502(b)(2). It is so ordered.