EAST ST. LOUIS SCHOOL DISTRICT No. 189, Plaintiff-Appellant, v. JOSEPH E. HAYES *et al.*, Defendants-Appellees.

Fifth District   No. 5—91—0208

Opinion filed December 4, 1992.

RARICK, J., concurring in part and dissenting in part.

Edward L. Welch, of Edwardsville, for appellant.

Paul M. Storment III, of Storment Law Offices, P.C., of Belleville, for appellee Joseph E. Hayes.

No brief filed for appellee Illinois State Board of Education.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

The subject of this appeal is a judgment entered by the circuit court of St. Clair County pursuant to a complaint for administrative review (Ill. Rev. Stat. 1989, ch. 110, par. 3—103) affirming the decision of defendant Illinois State Board of Education, reinstating defendant Joseph E. Hayes (hereinafter defendant) to his former position as assistant principal of Rock Junior High School, granting all back pay defendant would have earned, including any increases, and restoring all benefits, rights and privileges defendant would have retained had he remained on the job. Defendant's back pay was reduced by his outside earnings for a total judgment of $77,566.60. In this cause, plaintiff, East St. Louis School District No. 189, raises two issues: (1) whether delays in holding the dismissal hearing are attributable to defendant thereby requiring a reduction in the award of back pay, and (2) whether the hearing officer's decision, sustained by the circuit court, that plaintiff did not prove its case against defendant is against the manifest weight of the evidence. We affirm.

This case arises out of plaintiff's attempts to dismiss defendant as a tenured teacher because of defendant's alleged sexual intercourse with a seventh-grade student at Rock Junior High School. The student contends that she had sex with defendant on a Saturday in mid-March 1985. On January 2, 1986, the student gave birth to a male child. A paternity test was later conducted by the American Red Cross. It revealed that the relative chance of defendant's paternity of the child, assuming a 50% prior chance, is 99.99%. The following explanation of this conclusion was elicited during the Board's attorney's redirect examination of Mary Wallhermfechtel, a clinical laboratory manager and paternity-testing supervisor for Red Cross:

"RE-EXAMINATION
BY MR. WELCH

Q. Would you tell us what is meant by the statement contained in the conclusions on Exhibit 5, 'The relative chance of paternity, assuming a 50 percent prior chance, is 99.99 percent,' what does that mean?

A. That means assuming that the alleged father is equally likely as anyone else to have had intercourse with the mother at or about the appropriate time, based on that assumption, the

chances that he is the true father are 99.99 percent, and the chance that he is not the father is .01 percent."

Further explanation was elicited during questioning by the hearing officer:

"HEARING OFFICER: Madam Witness, what does the term assuming a 50 percent prior chance, what does that mean?

A. It means the alleged father is assumed by the lab to be equally likely as any other random individual of the same race to have had access or intercourse with the mother at or about the time, more or less likely than any other individual.

HEARING OFFICER: And the statement 99.97 percent of falsely accused men would be excluded as the father, does that mean that there is a 99.97 percent chance that someone falsely accused would be exonerated by your test?

A. That's right."

The school conducted an internal investigation after rumors of sexual activity between the student and defendant surfaced. On August 8, 1986, defendant waived his right to a presuspension hearing. Defendant was suspended by plaintiff without pay effective August 18, 1986. On September 22, 1986, plaintiff charged defendant with engaging in unprofessional conduct contrary to the interest of plaintiff in that defendant had sexual intercourse with a student, "a female who was not his spouse, who at the time was at least thirteen (13) but less than sixteen (16) years of age, and who was a student at Rock Junior High School." On October 17, 1986, a bill of indictment was returned against defendant charging him with aggravated criminal sexual assault. Defendant was, therefore, defending himself against charges brought by both plaintiff herein and the State.

A hearing officer was selected by agreement between plaintiff and a teacher from a panel provided by the Illinois State Board of Education. A series of letters between plaintiff's attorney, defendant's original attorney, and the hearing officer were sent back and forth in which the parties attempted to agree on a date for a dismissal hearing. Ultimately, the parties agreed to postpone the dismissal hearing until the criminal case against defendant was concluded. Plaintiff's attorney was under the impression that defendant had waived any right to back pay during the delay period should defendant prevail in both cases and be reinstated. Defendant changed attorneys during the period after indictment and before trial. On February 16, 1988, defendant's new attorney informed plaintiff's attorney that defendant had never agreed to waive back pay should he be reinstated. Plaintiff thereafter requested an immediate hearing without further delays.

The dismissal hearing did not occur, however, until after the criminal trial was completed on June 23, 1988. Defendant was found not guilty by a jury on the criminal charges pending against him. The dismissal hearing was held in November 1988 and took four days to complete.

According to the student, she and defendant had engaged in flirting prior to their sexual encounter. Defendant often winked at her and sometimes questioned her about whether she had a boyfriend or whether she was a virgin. Defendant asked her if she knew where they could go for sex, and at that time, she suggested they go to a motel. Defendant questioned her about whether she could keep such a liaison secret. After much negotiation, the two agreed to meet at Miles Davis School on a Saturday in mid-March. Defendant took the student to his home, but she was nervous about being there, so they went to a motel. The student did not know the name of the motel at the time, but later learned it had been the Lakeside Motel in East St. Louis. At the hearing, the student said that they were at the motel about 12:30 or 1 p.m., possibly later. She acknowledged that during previous discussions about the incident she had stated the incident occurred sometime around 4 or 5 p.m. According to the student, this was the only time the two engaged in sex. They remained at the motel for approximately one hour after which defendant took her back to Miles Davis School.

In the summer of 1985, the student's mother learned of her pregnancy. The student told her mother that the father of the child was "Keith Williams." By the fall of that year, friends of the student had indicated to her mother that defendant or some other teacher at Rock Junior High School was the father. The student's mother visited the principal and superintendent of Rock Junior High School and told them she thought her daughter might have been "messing around" with faculty members. Also during the fall of 1985, Albert Lockridge, a prior unsuccessful candidate for the school board, heard rumors of sexual activity between students and staff. He kept abreast of the rumors and wrote a letter and three memos to the superintendent in which he alleged defendant was the father of the student's child. The superintendent ordered an internal investigation. Following the investigation, and upon legal advice, the matter was referred to the East St. Louis police department.

As part of the police investigation, the student and her mother were interviewed. The student denied any sexual involvement with defendant. She insisted that Keith Williams was the father. The student stated Williams had since moved from the area. Police then asked the student and her mother to submit to polygraph examina-

tions. On February 27, 1986, just prior to talking to the polygraph examiner, the student broke down and stated that she had sex with defendant in March 1985. She later stated defendant was the father of the child but still insisted that she had also had sex with Keith Williams. It was later determined, and the student later admitted, that there was no person named Keith Williams. According to the student, she did not name defendant immediately because she wanted to protect him. She also believed that she and defendant had a meaningful relationship, but upon reflection she surmised, "I guess to him it was just something to do."

Defendant insists he never engaged in sex or any other type of improper behavior with the student. While he may have winked at the student, he contends that is a friendly gesture he uses frequently with students. Defendant introduced alibi testimony covering his Saturdays in mid-March 1985. Defendant claims he is extremely regimented and that all his Saturdays in mid-March were fairly typical. Defendant would leave his house at about 8:30 a.m. and go to Forest Park in St. Louis, Missouri, where he would participate in a marathon-running group. Participants would run between 8 and 10 miles and then have breakfast at the Pancake House in Clayton, Missouri. Defendant would then return home between 12:30 and 1 p.m. and would complete chores around the house at his wife's request. Defendant's wife agreed that this was defendant's routine in March 1985. Two witnesses from defendant's running group testified that defendant consistently exercised with them on Saturday mornings. Neither could pinpoint the exact dates he attended in March 1985. Defendant specifically remembered what he did on Saturday, March 9, and Saturday, March 16, 1985. March 9 is defendant's birthday. Defendant stated he ran at Forest Park in the morning, went to breakfast with the running group, and completed his household chores in the afternoon. Defendant's wife took him to dinner and shopping for his gift later in the evening. On Saturday, March 16, defendant attended a track meet at Eastern Illinois University in Charleston. A passenger in his car on that day verified the trip.

The hearing officer admitted into evidence the results of a polygraph examination administered to the student. The polygraph examiner opined that the student was telling the truth when she stated that defendant was the father of her child. The hearing officer also admitted into evidence the results of the paternity test conducted by the American Red Cross. Mary Wallhermfechtel, a clinical laboratory manager and paternity-testing supervisor at Red Cross, interpreted the results at the hearing. The blood test could not exclude defendant

as the father of the student's child, but Wallhermfechtel could not say defendant was definitely the father of the child based only on the blood test.

Because the student's testimony had been inconsistent over time and defendant's testimony had remained virtually unchanged, the hearing officer found defendant to be more credible. The hearing officer believed that defendant's firing was sincerely motivated, but that plaintiff failed to prove its case by a preponderance of the evidence. Defendant was reinstated to his former position, and plaintiff was ordered to pay defendant back pay for the time he had missed, reduced only by his outside earnings during that period of time.

On February 14, 1989, plaintiff filed a complaint for administrative review. The circuit court overruled plaintiff's complaint for administrative review, affirmed the award of the hearing officer, and entered judgment in the amount of $77,566.60. Plaintiff appeals from that judgment.

I

The first issue we address is whether delays in holding the dismissal hearing are attributable to defendant, thereby requiring a reduction in the award of back pay. Plaintiff contends that defendant is not entitled to back pay since the hearing was delayed only because defendant did not want to proceed to hearing while criminal charges were pending. Plaintiff claims it agreed to that delay because defendant had agreed to waive any claims to back pay should he be reinstated. Once plaintiff learned defendant no longer agreed to waive the issue of back pay, plaintiff insisted upon having the hearing scheduled immediately. Plaintiff claims that defendant refused to cooperate at that time and would not agree upon a hearing date. Plaintiff insists it made every effort to mitigate damages by insisting on an immediate hearing once it learned defendant no longer agreed to waive the issue of back pay, but defendant, on the other hand, did not use reasonable diligence or cooperate in good faith in the scheduling of the hearing and made no effort to mitigate plaintiff's damages. Plaintiff asks us to reverse and remand to the circuit court to determine what date after August 1986 would have been reasonable for the dismissal hearing to be conducted. Defendant responds, first, that he did not delay the proceedings out of negligence or wilfulness and his actions were reasonable under the circumstances. Second, defendant contends the issue of mitigation is waived because it was not raised in the court below. Assuming, *arguendo*, that plaintiff had raised failure to mitigate

damages in the circuit court, we are not convinced defendant violated his duty to mitigate damages.

■■ If by *negligence* or *wilfulness* an injured party allows damages to be enhanced unnecessarily, the increased loss falls upon the injured party. (*Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione* (1986), 144 Ill. App. 3d 934, 941, 494 N.E.2d 795, 800.) Under the theory of mitigation of damages, an injured party is not allowed to recover from a wrongdoer those damages which the party should have foreseen and could have avoided without undue risk, burden, or humiliation. *Grill v. Adams* (1984), 123 Ill. App. 3d 913, 921, 463 N.E.2d 896, 902, citing Restatement (Second) of Contracts §350(1) (1981).

■■ Here, both the hearing officer and the circuit court were aware of defendant's duty to mitigate damages. The hearing officer was so mindful of this requirement, he included several paragraphs in his order explaining his interpretation of events and expressing his belief that it would be unfair to deprive defendant of retroactive pay because of delays in the hearing. Specifically, the hearing officer stated:

> "There remains, however, one last matter upon which this hearing officer feels the need to elaborate to the parties. The teacher's failure to use his opportunity to be heard at the pre-suspension stage might very well be held against him in the determination of his back pay and benefits. After all, even though the school board is found herein to have insufficient proof to substantiate its charges, one purpose of the pre-suspension hearing is to give the teacher the opportunity to show them so before the gauntlet is thrown. For all we know, Hayes might have convinced the board at that stage; and his two and one half years of unemployment, the attendant strain on him and his family, and now the school district's very substantial payment for services not received, might all have been avoided from the outset. At first blush it might seem unfair that the school district should now have to pay for what Hayes himself permitted to occur when he did not contest the suspension at the earliest possible stage. After all, the board might reasonably have taken his lack of response as lending credibility to its information and belief, thereby giving it the basis upon which to proceed. Such is contemplated by the governing rules, and consequently the board might well feel that it got mousetrapped by Hayes when he 'waived' his pre-suspension hearing.
>
> Also, at one point the school board thought it had an agreement with Hayes whereby the school district would consent to

postpone this case until after the criminal case and Hayes would forego any right to back pay if he won. When that arrangement fell apart, and again since the criminal case was concluded, the school attorney has continued to insist on an early hearing.

The board might also feel it unfair to be responsible for back pay because Hayes refused to schedule this case until the criminal case was heard first, and because it took another four and one-half months after the criminal trial to bring this employment case to a hearing in November, 1988 (the school's attorney has persistently pressed for an immediate hearing during all that time).

Despite these legitimate considerations of the school board, on full balance it would be even *more* unfair to deprive Hayes of his retroactive pay and benefits simply because of his procedural error in judgement in August of 1986, because of his later need to defend his criminal case first, or because of his attorney's inability to turn his attention to this case immediately after the criminal case was over. These procedural twists and inconveniences would never have occurred if not for the much more substantial and fundamental mistake made by the board.

Thus, after serious extra deliberation it is determined that Hayes should receive his full remedy." (Emphasis in original.)

We do not view this finding as an abuse of discretion. We do not believe defendant's actions in postponing the hearing constituted a negligent or wilful act done solely to enhance or increase his damages. In our estimation, defendant would have welcomed the opportunity to return to work but was required instead to defend himself against charges brought by both plaintiff and the State.

## II

The other issue we are asked to consider is whether the hearing officer's decision, sustained by the circuit court, that plaintiff did not prove its case against defendant, is against the manifest weight of the evidence. Plaintiff argues if both the polygraph examination results and paternity test results are considered, the testimonial conflicts pointed out by the hearing officer take on an entirely different light. Plaintiff contends that both these test results were owed consideration by the hearing officer and his failure to take them into consideration, or at least explain why they were not taken into consideration, indicates that the decision was arbitrary and against the manifest

weight of the evidence. Defendant replies it is for the hearing officer to determine the weight and credibility of evidence and testimony presented.

Considering the fact that polygraph evidence is generally not admitted in criminal cases because it is not considered reliable and the fact that paternity tests are also considered inconclusive, it was not unreasonable for the circuit court to find the probative value of these two pieces of evidence to be minimal.

■■ The essential factual predicate for the blood test, access to or intercourse with the mother, was both contested and ultimately decided by the hearing officer in favor of defendant. As the clinical laboratory manager stated in cross-examination by defendant's attorney:

"Q. So, the first thing that has to be established by anyone in a hearing or a court of law is if Joe Hayes had intercourse with [M.Q.], isn't that correct?

A. Yes.

Q. And if this is not established, then your entire test and your entire results failed, isn't that right?

A. Yes."

Given the conflicting testimony in the case concerning access or intercourse with the mother and the probative, not conclusive, polygraph and paternity tests, the hearing officer's decision, affirmed by the circuit court, was not unreasonable and not against the manifest weight of the evidence.

On administrative review, neither this court nor the circuit court is to reweigh evidence or the determination of the credibility of witnesses, which is to be made by the agency. (*I.F. v. Department of Children & Family Services* (1986), 146 Ill. App. 3d 68, 71, 496 N.E.2d 1162, 1164.) The findings and conclusions of the administrative agency on questions of fact are held to be *prima facie* true and correct. (Ill. Rev. Stat. 1989, ch. 110, par. 3–110.) The reviewing court is to ascertain if the findings and decision of the administrative agency are against the manifest weight of the evidence. (*Peterson v. Board of Trustees of the Firemen's Pension Fund* (1973), 54 Ill. 2d 260, 262-63, 296 N.E.2d 721, 723.) Here, we will not disturb the hearing officer's conclusions.

A review of the hearing officer's order reveals that both the paternity test and the polygraph examination results were admitted into evidence over defendant's strenuous objections. The hearing officer then went through a thorough analysis of both the student's testimony and defendant's testimony and concluded that the student's testimony had been so varied over time that it was unbelievable, whereas

defendant's version of events had remained identical throughout all phases of the investigation and hearing. The hearing officer stated:

"As a consequence of these internal inconsistencies, the hearing officer has no way of knowing which portions of [the student's] story should be believed and which should not.

On the other hand, examining Hayes' story, even though only his wife can verify his alibis for all of the Saturday afternoons in the month of March of 1985, there is nothing in this case that indicates Hayes has told different stories at different times. By comparison, [the student] has done exactly that.

Thus, based on what was heard during the course of this hearing, it is not persuasive by a preponderance nor by any other objective standard that Dr. Joseph E. Hayes did what the school board came to believe."

In our estimation, the above language indicates the hearing officer did not believe defendant had access to the student in mid-March, as the student claimed. This conclusion was drawn from the fact that the student could not specify the Saturday in mid-March when she and defendant allegedly had sex, nor could she specify the time it allegedly occurred. At one point, the student claimed she and defendant met between 4 and 5 p.m., but she later testified the rendezvous occurred between 12:30 and 1 p.m. On the other hand, defendant had alibi witnesses who, while not being able to account for every Saturday in March 1985, explained defendant's usual Saturday routine. Two members of defendant's running group testified that defendant had been an active participant in the Saturday morning running group. Defendant's wife was able to account for defendant's whereabouts on each Saturday in March 1985, and another woman testified she attended a track meet with defendant on Saturday, March 16, 1985, at Eastern Illinois University in Charleston. Defendant clearly remembered what he did on March 9, 1985, as that was his birthday.

It was the hearing officer's duty to determine the credibility of the witnesses and the weight afforded their testimony. The hearing officer clearly believed the testimony of defendant and not the student. It is not for us to redetermine the hearing officer's decision. (See *Dotson v. Bowling* (1981), 102 Ill. App. 3d 340, 430 N.E.2d 44.) With this in mind, we cannot say the hearing officer's decision was against the manifest weight of the evidence.

Our supreme court has stated that in a criminal trial even stipulated-to polygraph evidence is not admissible because the process of accurately recording and then correctly interpreting those results "has not reached a level of sophistication that makes it generally

more probative than prejudicial." (*People v. Baynes* (1981), 88 Ill. 2d 225, 239, 430 N.E.2d 1070, 1077.) Our supreme court extended this holding in *Kaske v. City of Rockford* (1983), 96 Ill. 2d 298, 450 N.E.2d 314, to administrative hearings. The *Kaske* court found that the inherent deficiencies of the polygraph made the results of such an examination inadmissible in a hearing before the board of fire and police commissioners. Plaintiff herein has not shown any evidence that the results of polygraph examinations are now more reliable than they were when *Baynes* and *Kaske* were decided. There is, therefore, a serious question whether the results should even have been admitted into evidence. However, assuming *arguendo* that the results were admissible, the hearing officer rightly did not give great weight to the results.

While blood tests are admissible in actions to determine paternity (see Ill. Rev. Stat. 1989, ch. 40, par. 2511), the expert interpreting the results of this blood test did not conclude defendant was the father of the student's child. On cross-examination, the expert was asked:

"Q. So basically what you are telling us here is that with all these factors you can't tell us with great certainty who the father of the child is?

A. I couldn't sit here and say who the father of a given child is based only on the blood test."

The blood test does not sufficiently contradict the hearing officer's determination that defendant did not have access to the student in mid-March for us to reverse.

The mere existence of conflicting testimony is not sufficient to reverse an agency's decision as being against the manifest weight of the evidence, and where there is evidence to support the agency's determination, its decision should be affirmed. (*Finik v. Department of Employment Security* (1988), 171 Ill. App. 3d 125, 134, 524 N.E.2d 1148, 1155.) In our judgment, the hearing officer's findings, affirmed by the circuit court, were not against the manifest weight of the evidence. The unreliable polygraph examination and the blood test, which merely served to prove that defendant could not be excluded as the father of the student's child rather than to prove that defendant was, in fact, the father, do not serve as sufficient basis to reverse the hearing officer's determination that defendant, rather than the student, was telling the truth. Consequently, we will not disturb the determination that defendant should be reinstated to his former position and have his benefits, rights and privileges restored except for reduction of his back pay by his outside earnings.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby affirmed.

Affirmed.

HARRISON, J., concurs.

JUSTICE RARICK, concurring in part and dissenting in part:
I concur with the majority that the hearing officer's decision, as sustained by the circuit court, reinstating defendant Hayes to his former position with benefits, rights and privileges restored, is not against the manifest weight of the evidence. I believe, however, based on my interpretation of the record, that defendant should be estopped from collecting back pay.